# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

*UNITED STATES OF AMERICA*
*v.*
*LIONEL SHORTY*

CASE NUMBER: MJ 22-04072-001-PCT-CDB
ELECTRONIC CRIMINAL COMPLAINT

I, the undersigned, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**COUNT 1**

**On March 1, 2022, in the District of Arizona, within the confines of the Navajo Nation Indian Reservation, Indian Country, the defendant, LIONEL SHORTY, an Indian, did intentionally, knowingly, and recklessly assault O.B., an intimate partner, by strangling and attempting to strangle her.**

**In violation of Title 18, United States Code, Sections 1153 and 113(a)(8).**

**COUNT 2**

**On March 1, 2022, in the District of Arizona, within the confines of the Navajo Nation Indian Reservation, Indian Country, the defendant, LIONEL SHORTY, an Indian, did intentionally and knowingly assault O.B. with a dangerous weapon, that is a piece of wood, with intent to do bodily harm.**

**In violation of Title 18, United States Code, Sections 1153 and 113(a)(3).**

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

**SEE ATTACHED AFFIDAVIT INCORPORATED HEREIN.**

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

AUTHORIZED BY: *s/ AUSA Dimitra H. Sampson* DIMITRA SAMPSON Digitally signed by DIMITRA SAMPSON Date: 2022.03.02 15:44:33 -07'00'

X Pursuant to 28 U.S.C. § 1746(2), I declare that the foregoing is true and correct

Dustin Blazer Drace, Special Agent, FBI
Complainant's Name and Title

Complainant's Signature 03/02/2022
Date

x Sworn by Telephone

__________ at Flagstaff, Arizona
Date/Time City and State

Camille D. Bibles, U.S. Magistrate Judge
Name & Title of Judicial Officer

Camille D. Bibles Digitally signed by Camille D. Bibles Date: 2022.03.02 16:22:32 -07'00'
Signature of Judicial Officer

**ELECTRONICALLY SUBMITTED AFFIDAVIT OF PROBABLE CAUSE**

I, Special Agent Dustin Blazer Drace, being duly sworn, state the following:

1. I am a Special Agent of the Federal Bureau of Investigation (hereinafter FBI) and have been since January 2018. I am currently assigned to the Gallup, New Mexico, Resident Agency of the Phoenix, Arizona, FBI Field Division. I have received training at the Federal Bureau of Investigation Training Academy in Quantico, Virginia as well as training in the investigation of assault, murder, and other violent crimes.

2. In the course of my official duties, I am charged with the investigation of crimes occurring on (among other places) the Navajo Nation Indian Reservation within the District of Arizona. I am an investigative law enforcement officer of the United States, and I am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18 of the United States Code.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested complaint, and does not set forth all of my knowledge about this matter.

4. This case involves a violation of 18 U.S.C. § 1153: Offenses committed within Indian Country as follows: 18 U.S.C. § 113(a)(8) – Domestic Assault by Strangling/Suffocating; and, 18 U.S.C. § 113(a)(3) – Assault with a Dangerous Weapon by LIONEL SHORTY (hereinafter SHORTY), an Indian, who is an enrolled member of the Navajo Tribe. The events described in this document occurred within the confines of the Navajo Nation Indian Reservation, in the District of Arizona, unless otherwise described

in this Affidavit.

5. On March 1, 2022, the FBI was in receipt of information regarding a possible stabbing occurring at a residence located approximately one mile northwest of Ganado Lake. It was learned that the residence was inhabited solely by A.S., mother to SHORTY, and was described as a peach-colored, single wide trailer with orange trim.

6. It was learned from Navajo Department of Criminal Investigations Criminal Investigator Samantha Yazzie that the reporting party, later learned to be A.S., advised that SHORTY was stabbing his girlfriend O.B.

7. Your affiant was in the vicinity when information regarding the possible assault was received and arrived at the residence at approximately the same time as three uniformed Navajo Police Department (hereinafter NPD) officers operating three marked NPD emergency vehicles with emergency lights activated.

8. Upon arrival, it was learned that A.S. and O.B were not present at the location. SHORTY was located inside the residence by the NPD officers. SHORTY was observed by the officers to have a pocket-style knife around his neck. SHORTY was detained by NPD, subsequently arrested by the Tribe, and transported to the Window Rock Department of Corrections facility located in Window Rock, Arizona.

9. It was learned from CI Yazzie that dispatch was in contact with A.S., who advised that O.B. fled the residence following the initial emergency call, but that O.B. returned to the residence and A.S. had driven her to the Speedway gas station in Burnside, Arizona. A.S. then stated that she was going to drive to Sage Memorial Hospital in Ganado, Arizona. She was advised that law enforcement would meet her and O.B. at the

hospital.

10. While en route to the hospital, on the vehicle radio tuned to the NPD dispatch frequency, your affiant heard dispatch advise that O.B. clarified that she was not stabbed, "only A and B." Based on my training and experience in this case and others, as well as my understanding of law enforcement vernacular, "A and B" was a reference to "Assault and Battery."

11. Upon arrival at Sage Memorial Hospital, law enforcement was in contact with A.S., who was seated in the waiting room. She advised that O.B. was located in the Emergency Department of the hospital.

12. Your affiant was in contact with the attending physician and nursing staff overseeing the care of O.B. It was advised that O.B. appeared to have some abrasions and superficial injuries, but that the majority of the marks on her were several days old.

Interview of O.B.

13. On March 1, 2022, O.B. was interviewed in the Emergency Department at Sage Memorial Hospital by your affiant and CI Yazzie. O.B. provided the following information:

14. O.B. resided with SHORTY at her residence near Vanderwagen, New Mexico. They had been together for approximately three years. SHORTY resided with O.B. at her residence permanently and had lived together for nearly the duration of their relationship.

15. SHORTY and O.B. were at A.S.'s residence for a couple of days preceding the interview and the events described herein. SHORTY, his mother A.S., and O.B. were

assisting in preparing for a memorial service for A.S.'s mother (SHORTY's grandmother) who recently passed away. Other family members also traveled to the area for the memorial.

16. At an unknown time, but possibly on February 28, 2022, family members, including SHORTY's aunts, were at a residence on the family plot of A.S. and her relatives. SHORTY believed that he overheard his family members speaking negatively of him and he became frustrated.

17. On March 1, 2022, following the memorial service, SHORTY, A.S., and O.B. were present at A.S.'s residence. SHORTY and O.B. were in the bedroom on the northernmost end of the trailer, which she referred to as the back room, which had a large window overlooking the mesa outside. A.S. was in the residence, but was in another room.

18. SHORTY was upset because of the family drama. O.B. tried to console SHORTY, told him to calm down, and to let it go. SHORTY believed O.B. was getting mad at him, so he put his hands on her and pushed her. O.B. defended herself and pushed SHORTY back.

19. SHORTY then struck O.B. multiple times in the face with a closed fist. O.B. did not know how many times she was struck in the face, but advised that the punches were continuous. O.B. attempted to defend herself and fight back, but SHORTY forced her to the ground and continued to strike O.B.'s face. O.B. attempted to cover herself up and protect herself from SHORTY's attack.

20. O.B. was able to escape the bedroom and crawl into the hallway. SHORTY

got on top of O.B. while she was on the ground. O.B. was lying on her back and SHORTY continued to strike her before he put his hands around her neck. SHORTY squeezed O.B.'s neck to the point where O.B. could not breathe. O.B. almost blacked out before SHORTY backed off. SHORTY was standing and attempted to straddle O.B., but she continued to fight and kick him. At an unspecified time during the assault, but while they were in the hallway, SHORTY grabbed O.B.'s hair and ripped out a lock of hair.

21. SHORTY obtained a wooden 2x4 and used the item to strike O.B. while she was on the ground. She held her arm up to protect herself and he struck her three times with the piece of wood.

22. O.B. continued to try to get away from SHORTY and called out for A.S. At that time, SHORTY produced a pocketknife, told O.B. not to come back, and that he would kill her. She did not believe that SHORTY would kill her.

23. O.B. was able to crawl out from underneath SHORTY to the living room area. A.S. was already calling the police and, at that point, SHORTY ceased his attack on O.B. O.B. left the residence and walked for a little while before returning and telling A.S. to drive her to Burnside to meet O.B.'s sister.

24. Initially, O.B. advised that incidents similar in nature as described above occurred approximately three times over the duration of their relationship. O.B. described the behavior as not normal. SHORTY only acted that way when he was drinking, but O.B. stated that he was not drinking on March 1, 2022.

25. Later in the interview, it was learned that O.B. had regular physical altercations with SHORTY of varying intensity.

Physical Examination of O.B

26. Throughout and at the conclusion of the interview of O.B., she assisted investigators in reviewing possible injuries that were visible. Of note were the following injuries and the manner in which the injuries were sustained, as described by O.B.:

a. Bruising and swelling in the area of her left cheek as the result of strikes with a closed fist by SHORTY the day of the interview;
b. Dried blood along the left side of her nose of unknown origin;
c. Bruising, swelling, dried blood, and a possible abrasion near her hairline as a result of strikes with a closed fist and ongoing scuffle with SHORTY the day of the interview;
d. Redness underneath her chin and along her neck and a scratch stretching from neck to her shirt line as a result of SHORTY placing his hands around her neck, squeezing, and "choking" O.B. the day of the interview;
e. Bruising and swelling in the area of her left forearm as the result of strikes with a wood 2x4 by SHORTY the day of the interview;
f. Bruising and swelling of her left hand as the result of the engagement with SHORTY the day of the interview. Further analysis of her hand revealed that O.B. had difficulty moving her thumb and making a fist;
g. A silver-dollar sized bald spot on her scalp to the left of her midline as the result of SHORTY grabbing her hair and ripping it out the day of the interview;
h. Redness on her chin and swelling inside her mouth from getting kicked

by SHORTY during an altercation earlier in the week;

i. Silver dollar sized bruises on both her left and right triceps as a result of being struck by SHORTY during an altercation earlier in the week;

j. An abrasion on the left side of her back of unknown origin; and,

k. A scar in the middle of her forehead just above her eyes that she sustained approximately two years ago when SHORTY became upset while they were chopping wood and he hit her in the face with a piece of wood.

27. In my training and experience in this case and others where a victim sustains injuries as the result of blunt trauma, it was my belief that the attending physician conducted an inadequate History and Physical examination of O.B., as it appeared O.B. suffered a broken bone in her hand or forearm due to her substantial swelling and bruising, as well as her inability to mobilize her thumb.

28. The attending physician was advised of your affiant's concerns and stated that x-rays in addition to those already completed would be conducted.

<u>Interview of A.S.</u>

29. On March 1, 2022, A.S. was interviewed at Sage Memorial Hospital in Ganado by your affiant and CI Yazzie. A.S. provided the following information:

30. On the date of the interview, A.S. was preparing for a memorial for her mother who recently passed. A.S.'s son SHORTY and his girlfriend O.B. were at the residence of SHORTY's relatives, which was approximately a quarter mile west of A.S.'s residence, to meet with anyone who may be bringing donations or offerings for the passing. A.S. did not believe that SHORTY and O.B. were having any issues.

31. The day prior to the interview, SHORTY took some soda and punch to a house to prepare for the memorial. He went inside the house and A.S.'s sisters were in the back room gossiping. SHORTY overheard them say something about him that upset him. SHORTY then took out his frustration on A.S. verbally and O.B. physically.

32. At approximately noon or 12:30 PM on the day of the interview, SHORTY and O.B. arrived at A.S.'s trailer. A.S. believed she smelled liquor on SHORTY and O.B. A.S. was upset and offended that they would be drinking and "having a party" on the day that A.S. was trying to grieve for her mother.

33. At approximately 1:30 or 1:45 PM, A.S. heard SHORTY and O.B. arguing in the back room of her residence. After that, she thought she heard them fighting and heard things being knocked over. A.S. heard O.B. yell, "Get away, don't bother me!"

34. A.S. went to the back room to see what was going on. SHORTY and O.B. came into the hallway and they were fighting. A.S. told SHORTY to stop and not to treat his girlfriend like that. SHORTY accused O.B. of talking about his grandmother all this time. A.S. told them to stop fighting and SHORTY and O.B. went their separate ways for a little bit.

35. After a while, A.S. went back to the living room and heard SHORTY and O.B. fighting again. A.S. observed O.B. lying on the floor with SHORTY sitting on top of her. SHORTY was hitting O.B. with a closed fist in the face and "choking" O.B. A.S. saw O.B. gasping for air. O.B. was trying to defend herself and was hitting SHORTY back. O.B. kicked SHORTY in the face. A.S. told SHORTY to let her go, that SHORTY was "choking" O.B. SHORTY backed off and stopped "choking" O.B.

36. A.S. went back to the living room. SHORTY started yelling at A.S., telling her to get out of there and that what was happening was none of her business. It was between him and O.B. A.S. was scared of SHORTY and believed he was going to hit her too because he hit her before approximately three years ago.

37. A.S. heard O.B. yelling because SHORTY was hitting her again. A.S. observed SHORTY hitting O.B. with a wooden "4x4" while they were fighting in the hallway. The board was what A.S. used for rug weaving. She described the board as approximately three feet long, unfinished and unpainted with a nail at each end. SHORTY hit O.B. on the back and on the arm. SHORTY then sat on O.B. and was hitting her in the face with his fist.

38. A.S. heard O.B. yell again, "mom, mom, he has a knife, he's going to stab me!" When A.S. heard O.B., she thought O.B. might have been stabbed. A.S. called the police.

39. A.S. went to SHORTY and A.S. observed the knife in SHORTY's hand. SHORTY folded the knife and put it in his pocket. SHORTY then backed away. A.S. told him not to be doing that. SHORTY followed A.S. back to the living room. A.S. sat down in her chair in the living room and SHORTY proceeded to yell at her face-to-face.

40. At that time, O.B. got up and ran out the door. SHORTY started cleaning up the broken things in the hallway. All of the furniture, books, and other belongings that were located in the hallway were in disarray.

41. A.S. went to look for O.B. and found her hiding in the brush near A.S.'s relatives' residence up the road. O.B. returned and when A.S. was back at her residence,

it was quiet. A.S. believed that SHORTY passed out in the back room from being so drunk.

42. After A.S. found O.B., she asked if she was OK. O.B. stated that she was OK, but that her arm hurt. A.S. observed a bald spot on O.B.'s head. A.S. advised that O.B. did not previously have a bald spot on her head.

43. SHORTY and O.B. had been together for three years. A.S. had heard that they fought at times throughout their relationship, but A.S. never saw anything like what happened at her residence.

44. A.S. told O.B. she needed to leave SHORTY before he killed her. A.S. was aware that SHORTY treated previous girlfriends like that. He had a history of physical abuse.

45. A.S. was going to get a restraining order against SHORTY so he wouldn't hit or hurt her again. When he wasn't drinking, SHORTY was OK. But after the first sip, he turned into a monster.

Search of Residence of A.S.

46. On March 1, 2022, verbal and written consent was obtained from A.S. to conduct a search of her residence. Your affiant, CI Yazzie, and a uniformed NPD Officer were present for the search. CI Yazzie took photographs of the residence and your affiant collected evidence.

47. A.S. advised that when she left the residence, the residence was in disarray and broken items were present on the floor. However, upon arrival by law enforcement personnel and A.S., she advised that the residence appeared to have been cleaned up.

48. Two boards were located in a room down the hall from the front room where A.S. and O.B. advised the assault took place. A.S. advised that the boards were not located there before she left with O.B. earlier in the afternoon.

49. The boards were located together and were nearly identical in appearance. They matched the description provided by A.S.: approximately three feet long, unfinished and unpainted, with a nail at each end. The boards were seized as evidence.

50. Attempts to locate a lock of hair were unsuccessful.

51. Based on the foregoing, there is probable cause to believe that Lionel Shorty committed one count of Domestic Assault by Strangling/Suffocating, in violation of 18 U.S.C. §§ 1153 and 113(a)(8) and one count of Assault with a Dangerous Weapon, in violation of 18 U.S.C. §§ 1153 and 113(a)(3).

52. This affidavit was sworn telephonically before a United States Magistrate Judge legally authorized to administer an oath for this purpose.

**Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.**

03/02/2022
Date

Dustin Blazer Drace
Special Agent, FBI

Subscribed and sworn to before me telephonically on this 2nd day of March, 2022.

Camille D. Bibles
Digitally signed by Camille D. Bibles
Date: 2022.03.02 16:21:35 -07'00'

HONORABLE CAMILLE D. BIBLES
United States Magistrate Judge